STATE OF VERMONT
ENVIRONMENTAL COURT

|  |  |  |
|---|---|---|
| SECRETARY, VERMONT AGENCY<br>OF NATURAL RESOURCES,<br>　　Plaintiff | }<br>}<br>}<br>}<br>} | |
| v. | }<br>} | Docket No. 102-6-09 Vtec<br>(Hyde Park site) |
| KEN BACON AND KEN BACON, JR.,<br>d/b/a BACON TIMBER HARVESTING,<br>　　Respondents | }<br>}<br>}<br>}<br>} | |

## DECISION ON THE MERITS

This environmental enforcement proceeding was heard before the Vermont Environmental Court on January 26, 2010, Thomas S. Durkin, Environmental Judge presiding. Upon the close of evidence from all parties,[1] the Court conducted preliminary deliberations and thereafter made the initial factual and legal determination that the violations alleged by ANR had been committed.

The Court thereafter instructed counsel for the Vermont Agency of Natural Resources ("ANR") to submit a post-trial memorandum concerning its requests for relief and allowed Respondents an opportunity to respond to ANR's post-trial filings. After those filings were received by the Court, the Court began its deliberations, research, and drafting of this Decision. This Decision is intended to address all claims and defenses offered by the parties in the merits hearing.

### Introduction and Procedural Background

The Secretary of the Agency of Natural Resources ("Secretary") issued an Administrative Order ("Order") to each Respondent on June 2, 2009. The Order alleged violations of 10 V.S.A. § 1259(a). Respondents requested a hearing on the Order, which was the subject of the January 26, 2010 merits hearing, noted above. The following is an outline of the facts the Court found most credible and persuasive in concluding that the alleged violations had occurred. Following

---

[1] At the close of evidence, Respondents requested permission to submit written testimony from their trucking contractor to substantiate their claim that their site preparation work had been properly performed. The Court granted this request. However, Respondents failed to file written testimony from any third-party witness.

this outline of factual findings, we explain and render our legal conclusions on the Secretary's penalty and compliance/injunctive relief requests.

### *Relevant Facts*

Respondents are engaged in the business of logging under the business name "Bacon Timber Harvesting." Respondent Ken Bacon has been in the logging business for approximately thirty years. Respondent Ken Bacon, Jr. has been in the logging business for approximately eight to nine years. Respondent Ken Bacon now works with and for his son, Respondent Ken Bacon, Jr., as Bacon Timber Harvesting.

The Secretary has established rules and standards entitled "Acceptable Management Practices for Maintaining Water Quality on Logging Jobs in Vermont" ("AMPs"). The Secretary, pursuant to his statutory powers, has directed that all loggers employ AMPs before, during, and after logging operations, so as to ensure the prevention of unpermitted discharges into State waters. These AMPs require safe logging management practices, including the installation of appropriate stream crossings, appropriate locations for log landings, installation of waterbars on skid roads, and a prohibition against discharging logging slash and debris in State waters.

In July 2006 Respondents contacted Dave Wilcox, Forester for the Department of Forest, Parks and Recreation (FP&R) to apply for a Special Use Permit (SUP) for the purpose of using State-owned land to access privately owned land on which Respondents intended to conduct timber harvesting operations. The access area is located at the Green River Reservoir State Park, on Green River Reservoir Road in Hyde Park, Vermont ("State property"). The private land that Respondents wished to access is owned by Eli Hall ("Hall property"). Respondent Ken Bacon, Jr. met with Mr. Wilcox at the State property access site on July 17, 2006. At that time they located a suitable landing and access trail to the Hall property, discussed landing construction details, and terms of the SUP. Respondents obtained the SUP on August 1, 2006. The SUP contains several conditions. Among them, Condition #4 states, "all activities associated with this right-of-way are subject to the rules and standards found in 'Acceptable Management Practices for Maintaining Water Quality on Logging Jobs in Vermont.'"

In early August 2006 and again on August 31, 2006, Mr. Wilcox visited the site to check on compliance with the conditions established for Respondents' logging operations. During the August 31 visit, Mr. Wilcox observed that Respondents were using an unauthorized skid trail on

State property to access portions of the Hall property. He instructed Respondents not to use the unauthorized skid trail and to complete remedial work on the trail when conditions dried out. Mr. Wilcox also instructed Respondents not to operate on the site at all during periods of wet weather.

On November 1, 2006, Mr. Wilcox again visited the Respondents' logging site on the Hall property with Brad Greenough, another Forester with FP&R, as there had been recent wet weather and he wanted to check on Respondents' operation. During this visit, Mr. Wilcox observed that Respondents were conducting logging activities and, as a result of operating in wet weather, were causing the main skid trail and unauthorized skid trail to become extremely rutted and muddy. Mr. Wilcox immediately shut down Respondents' logging operation because of these conditions.

Mr. Greenough worked with Respondent Ken Bacon to install temporary waterbars on the main skid trail. During this visit, Respondent Ken Bacon, Jr. admitted they were planning on using the trail, without the waterbars, until he told them not to do so. They also discussed the need to bring in an excavator to install waterbars and smooth out the skid trails during closeout work the following spring or summer. On November 9, 2006, Mr. Wilcox sent Respondents a letter regarding the November 1 site visit, advising Respondents that arrangements could be made during frozen conditions to look at the site and that there was a possibility of permission being given to use the trail during frozen conditions.

On December 19, 2006, Mr. Wilcox visited the Hall property in response to a complaint of unlawful discharges. During this visit, Mr. Wilcox observed Respondents had crossed several unnamed streams with logging equipment without any AMP structures installed. Respondents had repeatedly crossed the streams, resulting in discharges of sediment. These unnamed streams constitute State waters. He also observed several areas where logging slash and debris had been deposited, and therefore discharged into the streams. Respondents did not have any permits for the observed discharges. Following the visit, Mr. Wilcox attempted several times to arrange a site visit with Respondents to review work that needed to be done in order to come into compliance with the AMPs, but he was unable to secure Respondents' assistance.

On January 26, 2007, Mr. Wilcox sent Respondents another letter, this time summarizing his findings from December 19, 2006, his attempts to make contact, and the need to immediately address the issues at the Hall property. In reply, Respondents sent Mr. Wilcox a letter dated

January 29, 2007, in which Respondents indicated they would address issues documented by Mr. Wilcox. Mr. Wilcox thereafter followed up with Respondents by reply letter dated February 20, 2007. In that letter, Mr. Wilcox again outlined the issues on both the State and Hall properties and indicated that conditions were suitable to conduct remediation work in late December 2006. Respondents chose not to respond to Mr. Wilcox's request that a follow-up site visit be scheduled; Mr. Wilcox thereafter advised that he would visit the site when weather permitted.

On May 7, 2007, Mr. Wilcox visited the Hall property and found another area on the unnamed stream where logging slash and debris had been discharged, as well as an additional stream crossing not observed previously. Neither areas had AMP structures in place; both areas showed evidence of sediment discharges. Mr. Wilcox thereafter made several attempts to arrange a site visit with Respondents, eventually scheduling a visit for June 4, 2007. Respondents were notified of this scheduled visit and were requested to attend.

On June 4, 2007, Mr. Wilcox visited the State and Hall properties with Environmental Enforcement Officer (EEO) Sean McVeigh. Despite being advised of the meeting, Respondents did not attend. During this visit, the officials again viewed the areas where discharges of sediment and logging debris had previously been observed. They also observed that discharge of sediment into these stream-crossing areas had continued since Mr. Wilcox's December 19, 2006 and May 7, 2007 site visits. At one crossing location, Respondents' repeated crossing completely eliminated any discernible stream channel. In addition, sediment from at least one crossing was observed to have moved downstream to another crossing.

In total, Respondents made repeated crossings at six locations on the unnamed streams without any AMP structures in place. Respondents caused logging slash and debris to be discharged into approximately 1,000 feet of stream length.

On June 18, 2007, EEO McVeigh issued a Notice of Alleged Violation ("NOAV") to Respondents and Mr. Hall for the observed discharge violations. No response was received from the Respondents. Mr. Wilcox subsequently arranged with Mr. Hall to bring in an excavation contractor, Alan Cary, to perform the required closeout and remediation work on each property. Due to Respondents' failure to respond in a timely manner, Mr. Hall was required to bear the cost of this work.

On October 4, 2007, Mr. Wilcox met with Mr. Cary at the site to discuss remediation work and observed that most of the logging slash and debris had been removed from the streams.

4

Mr. Cary completed remediation work on both the State and Hall properties as of October 16, 2007; Mr. Hall was required to pay Mr. Cary for his work.

Respondents violated 10 V.S.A. § 1259(a) by failing to follow AMPs, which resulted in discharges of material into State waters without a permit.

*Penalty*

In accordance with 10 V.S.A. § 8010(b), the Secretary is required to consider the following factors in determining the amount of the penalty; pursuant to 10 V.S.A. § 8012(b)(4) the Court must then review and determine anew the amount of penalty for the violations using these same criteria:

1. actual or potential harm to human health and the environment;

2. presence of mitigating circumstances including unreasonable delay on the part of the Secretary in seeking enforcement;

3. whether the respondent knew or had reason to know the violation existed;

4. record of compliance;

5. economic benefit gained from the violation;[2]

6. deterrent effect of the penalty;

7. actual cost of enforcement; and

8. length of time the violation has existed.

Based upon the evidence presented at trial, and after the Court has afforded such evidence the weight and credibility it deems appropriate, we render the following legal determinations on each of these criteria.

*Degree of actual or potential impact to the environment (10 V.S.A. § 8010(b)(1))*

Respondents' activities caused actual harm to State waters. Their repeated stream crossings without AMP structures in place caused discharges of sediments at each of the six crossings. In addition, sediment from at least one crossing was observed to have moved downstream to another crossing. At one crossing location, Respondents' repeated crossing completely eliminated any discernible stream channel. Logging slash and debris were observed in approximately 1,000 feet of stream length, and it served to impede water flow and compound

---

[2] Effective July 1, 2008, the recapture of economic benefit was separated from the penalty factors in 10 V.S.A. § 8010(b) and is now found in 10 V.S.A. § 8010(c)(2). The Secretary submits the discharge violations occurred and were observed following the statutory change and therefore the amended statute applies to the recapture of economic benefit. The Secretary submits that in this case there is no practical difference in the amount requested under this criterion.

sediment buildup in the streams. Given the extensive impacts throughout the site, we conclude that the significant penalty requested by the Secretary should be imposed.

### *Mitigating circumstances (10 V.S.A. § 8010(b)(2))*

We find no mitigating circumstances in Respondents' favor in this case. The Secretary sought enforcement for the violations at issue in a timely manner. Respondents have presented no reasonable or relevant evidence to mitigate any penalty imposed by the Court, thereby leaving this Court with no choice but to conclude that no mitigating circumstances exist in this case.

### *Did Respondents know or have reason to know the violation existed (10 V.S.A. § 8010(b)(3))*

Respondents knew and had reason to know the violations existed. Respondents were issued a SUP to access the Hall property. The SUP contained a specific provision identifying the AMPs. While the SUP only addressed conditions on the State property, Respondents have readily admitted that they knew AMPs must be utilized, where appropriate, on all Vermont logging jobs.

The SUP served to put Respondents on notice of the specific AMP rules and standards applicable to their logging job. Further, Respondent Ken Bacon has been in the logging business for thirty years. The AMPs were enacted in 1987. Mr. Bacon acknowledges that he had actual notice of AMP applicability, since in 2001, he entered into a Consent Order with the Vermont Attorney General's Office for violations of these very same AMPs, 10 V.S.A. § 1259(a), and Vermont Solid Waste Management Rule 6-302(d). He therefore knew of the prohibition against unpermitted discharges to State waters and the applicability of AMPs to logging jobs.

Respondent Ken Bacon, Jr. has been in the logging business for approximately eight to nine years and acknowledged his awareness of the AMPs during the merits hearing. Despite all of these factors, Respondents failed to comply with any of the AMPs at the Hyde Park site.

### *Record of compliance (10 V.S.A. § 8010(b)(4))*

As discussed above, Respondent Ken Bacon entered into a Consent Order with the Vermont Attorney General's Office in 2001 for violations of AMPs, 10 V.S.A. § 1259(a), and Vermont Solid Waste Management Rule 6-302(d). The Orleans Superior Court signed the Consent Order on June 11, 2001 in Docket No. 193-7-00 Oscv. Thus, the evidence revealed that the elder Mr. Bacon had already been subjected to compliance proceedings, enforcement litigation, and fines for violations similar to those he and his son committed on the State and Hall

properties. Even after this experience, Respondents seem unwilling to take the necessary steps to adhere to AMP logging rules and standards that the Secretary has administered for the last twenty-three years.

### *Economic benefit gained from the violation (10 V.S.A. § 8010(c)(2))*

Respondents recognized an economic benefit by failing to employ AMP stream-crossing structures prior to and during logging operations and by failing to conduct closeout work. These benefits are derived from the avoided time and costs of performing these activities.

Respondents constructed and utilized six stream locations without any AMP structures in place. Simple poled fords would have satisfied the AMP rules and standards for five of these stream-crossing locations. These poled fords would have taken approximately 1.5 hours to construct, at a cost of approximately $60 per hour. As there were five locations where this type of structure would have been recommended, the total cost associated with installation of five poled fords would have been $450.

A culvert crossing would have been recommended for the other stream crossing location; this structure would have taken approximately three hours to construct, at a cost of approximately $100 per hour, given the need to use excavation equipment. Thus, an appropriately sized culvert for this location would have cost approximately $300 to construct.

Respondent also avoided costs associated with necessary closeout work they chose not to conduct, despite discussing the need for such work with Mr. Wilcox during the November 2006 site visit, which Mr. Wilcox reiterated in subsequent correspondence. As a result, the landowner, Mr. Hall, had to arrange and pay for this work to be completed, which consisted of installation of waterbars near several stream crossings, smoothing rutted areas, and applying seed and mulch. This work took approximately five hours to complete, at a total cost of $500.

Respondents chose not to install or even attempt to install any type of AMP stream-crossing structures before or during logging operations, even after being provided with ample notice and opportunity to bring the Hall property into compliance. We conclude that Respondents should not be afforded the benefit of being able to avoid both the time and costs associated with these needed activities. By not installing and implementing the AMPs, Respondents recognized an economic benefit through both a competitive advantage in time saved and financial savings through avoided costs. The Secretary submits the total economic benefit in this case is approximately $1,250.

7

*Deterrent effect of the penalty (10 V.S.A. § 8010(b)(6))*

Given Respondents' knowledge of the AMPs and applicable law, we conclude that a significant penalty is necessary to deter similar unlawful actions in the future by Respondents and others in the regulated community. Respondent Ken Bacon has previously violated 10 V.S.A. § 1259(a) as it relates to AMPs. Respondents were also issued a SUP over State land, at their request, so that they could access the portion of the Hall property that they had contracted to log. Thus, Respondents received actual notice that their conformance with AMP rules and standards was required on this specific logging job and all Vermont logging jobs where streams were to be crossed. Nonetheless, Respondents chose to ignore the AMP rules and standards. The Agency and FP&R personnel made multiple trips to Respondents' job site and otherwise attempted to assist Respondents in achieving compliance. Respondents chose to ignore or disregard all these Agency and FP&R efforts, including issuance of a NOAV. Therefore, we conclude that imposition of a significant penalty is appropriate in this case to deter similar violations in the future by Respondents and others in the regulated community.

*Cost of enforcement (10 V.S.A. § 8010(b)(7))*

ANR officials incurred enforcement costs as a consequence of Respondents' violations. Mr. Wilcox spent approximately eighty-six hours in connection with site visits, administrative activities, preparing the case for enforcement, preparing for the merits hearing, and testifying at the merits hearing. His hourly salary including benefits is $33 per hour. His costs therefore total approximately $2,838. EEO McVeigh spent approximately 16.5 hours in connection with site visits, administrative activities, preparing for the merits hearing, and testifying at the merits hearing. His hourly salary including benefits is $40. His costs therefore total approximately $660. Based on their testimony, the costs ANR incurred as a consequence of Respondents' violations total at least $3,498.

*Length of time the violation has existed (10 V.S.A. § 8010(b)(8))*

Respondents conducted logging activities from August 2006 to November 2006. Despite Agency efforts to achieve compliance, Respondents failed and refused to conduct any remediation efforts on the Hall property until October 2007. Respondents failed to complete the necessary remediation measures; much of the remediation was completed by and paid for by others.

As discussed above, Agency personnel observed unlawful and unpermitted stream discharges in December 2006, as well as continuation of such discharges at several subsequent site visits in May and June 2007. While Respondents' logging activities occurred over a period of several months, the resulting discharge violations occurred during that time and continued for a significant period of time thereafter.

For all of the foregoing reasons, the Secretary requests the Court impose a penalty of $7,000 for the violations, plus $1,250 for economic benefit, plus $3,501 for the costs of enforcement, for a total penalty of $11,751.

### *Injunctive Provisions*

The Court has the authority to affirm an administrative order issued by the Secretary, or vacate and remand an order when the procedure contained in the order is not reasonably likely to achieve the intended result. 10 V.S.A. § 8012(b)(2). The Administrative Order in this matter requires Respondents to participate in logger education training, comply with applicable laws, notify FP&R of upcoming logging jobs, and permit inspections of jobs; all during the following three-year period. The Order also includes additional penalties for noncompliance with these provisions. The directives contained in the Order specify that:

B. No later than December 15, 2009, Respondents shall contact FP&R to enroll in the "Logger Education to Advance Professionalism" ("LEAP") Program.

C. Respondents shall participate in LEAP training when it is next offered in the Spring of 2010. Respondents shall attend no less than three days of training which shall include the following topics to the extent possible: Managing and Using Forest Ecosystems; Professionalism in Forestry; and Forest Water Quality, Erosion Control, and Wetlands. Respondents shall provide proof of satisfactory completion of the above training to FP&R within 30 days of the conclusion of the LEAP training. In the event Respondents fail to participate in, and satisfactorily complete, the LEAP training in accordance with this paragraph, Respondents shall pay a penalty of $2,000. This amount shall be in addition to the penalty amount specified in paragraph A [of the Administrative Order]. Payment shall be received no later than August 1, 2010. Payment shall be by check made payable to the "Treasurer, State of Vermont" and forwarded to the address listed in paragraph A [of the Administrative Order].

D. Respondents shall implement and comply with all logging AMPs and apply for and obtain all necessary logging-related State environmental permits on all future logging operations.

E. Respondents shall notify FP&R in writing no less than five (5) days prior to commencement of any logging operation in Vermont. Specifically, Respondents shall send written notice to the District AMP Forester in the District where the logging

operation is to take place. The notice shall include the planned starting date of logging, the size of the parcel to be logged, and directions to the job site. Respondents shall provide this notice for a period of three (3) years from the effective date of this Order. In the event Respondents fail to notify FP&R of any upcoming logging operation in accordance with this paragraph, Respondents shall pay a penalty of $500 for each instance of non-compliance. This amount shall be in addition to the penalty amounts specified in paragraphs A [of the Administrative Order] and C above. Payment shall be received no later than fifteen (15) consecutive calendar days following written notice by the Agency. Payment shall be by check made payable to the "Treasurer, State of Vermont" and forwarded to the address listed in paragraph A [of the Administrative Order].[*]

F. Respondents shall permit employees and representatives of FP&R and the Agency to inspect Respondents' logging activities upon receipt of 24-hour notice, for the three (3) year period.

These directives serve two purposes. First, by participating in training, Respondents will receive education on the AMPs, applicable laws relating to water quality, and ways to protect water quality that comply with the AMPs. Second, by notifying FP&R of upcoming logging jobs, Respondents will have the opportunity to work with FP&R before starting a job to identify AMPs that would be appropriate for the particular site. This is a proactive approach that can serve to minimize the need to respond to any complaints, reduce the likelihood of discharge violations, and ultimately help to better protect State waters during logging activities. The Administrative Order's directives set forth steps that are reasonably likely to achieve these intended results.

## *Conclusion*

Based on the evidence presented at the merits hearing, the Court concludes that by failing to follow AMPs, which resulted in discharges of material into waters of the State without a permit, Respondents violated 10 V.S.A. § 1259(a). The Court imposes a total penalty in the amount of **$11,751**, in addition to any penalty amount imposed in Docket No. 101-6-09 Vtec. Due to the additional time expended in these proceedings the Court modifies the following deadlines in the Administrative Order, so as to allow sufficient time for Respondents' compliance:

➢ The deadline in paragraph B is hereby changed from "December 15, 2009" to "December 15, 2010."

---

[*] The penalty amounts specified in paragraphs C and E of this Administrative Order shall be concurrent with, rather than in addition to, paragraphs C and E of the Administrative Order for the Washington site.

➢ The two deadlines in paragraph C are hereby changed from "Spring of 2010" to "Spring of 2011," and "August 1, 2010" to "August 1, 2011."

➢ The Respondents are hereby ordered to comply with paragraphs B through F as modified above.

This completes the current proceedings before the Court in this Docket. A Judgment Order accompanies this Decision.

Done at Berlin, Vermont as of this 19th day of April, 2010.

_____

Thomas S. Durkin, Environmental Judge